UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTHONY HARP,

                CASE NO. 5:19-cv-13789
*Plaintiff,*        District Judge Judith E. Levy
                Magistrate Judge Patricia T. Morris

*v.*

VICTORIA HALLETT,
TRANSPORTATION OFFICERS,
DENNIS LASHLEY,
DONALD DRUM,
CARL LADD,

        *Defendants.*
_____/

## REPORT AND RECOMMENDATION ON DEFANDANT VICTORIA HALLETT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 72)

### I.   RECOMMENDATION

For the following reasons, **I RECOMMEND** that the Court **DENY** Defendant Victoria Hallett's motion for summary judgement (ECF No. 72).

### II.   REPORT

#### A.   Background and Introduction

Anthony Harp is an inmate with prostate cancer in the custody of the Michigan Department of Corrections ("MDOC").  (ECF No. 1, PageID.8; ECF No. 33-1,

1

PageID.144).  Beginning in spring of 2019, transportation officers would regularly drive Harp to a nearby hospital to receive radiation treatment.  (ECF No. 35-3, PageID.234).   But the officers treated Harp with hostility, often calling him derogatory terms such as a "blind cripple" and a "son of [a] bitch." (*Id.*)  Unwilling to tolerate the officer's comments, Harp eventually refused treatment altogether. (*Id.*)

Concerned about Harp's refusal, one of his physicians, Doctor Victoria Hallett, asked him to sign a "release of responsibility" form on May 15.  (*Id.*; *see also* ECF No. 72-1, PageID.796; ECF No. 74, PageID.862–63).  Harp refused to sign the form, and Hallett then told him she had learned that nursing staff suspected him of hoarding his prescribed morphine pills on at least two occasions.  (ECF No. 72-1, PageID.796, 814; ECF No. 74, PageID.862–63).   Hallett ended Harp's prescription "all at once," without allowing him to taper off morphine.  (ECF No. 72-1, PageID.814).  Before this appointment, neither Harp's medical record nor his misconduct report mentioned that prison staff suspected him of hoarding opioids. (ECF Nos. 35-4, 72-1)

When Hallett ended Harp's prescription, Harp had been taking sixty milligram morphine pills twice per day for the last six months.  (ECF No. 72-1, PageID.800). And just a day after his prescription ended, West began to feel symptoms of withdrawal.  (ECF No. 72-1, PageID.800).  Indeed, over the next several weeks,

Harp consistently reported withdrawal symptoms such as headaches, dizziness, "aching" pain throughout his "entire body," and "loose stools." (*Id.* at PageID.800–826). Despite his complaints, Hallett did not allow Harp to taper off morphine, nor did she prescribe other medication to alleviate his symptoms. (*Id.* at PageID.814). While she did note that she would "consider[]" prescribing NSAIDS almost a week after ending Harp's morphine prescription, she did not indicate whether this was intended to ease Harp's withdrawal symptoms, and Harp's medical record does not indicate that Hallett ever added any new NSAIDs to his medication regimen after ending his morphine prescription. (*Id.*) (*Compare id.* at PageID.758, *with id.* at PageID.851–52).

Harp later brough this action against Hallett under 42 U.S.C. § 1983, accusing her of violating his Eighth Amendment right to be free of cruel and unusual punishment. (ECF No. 1). He accuses Hallett of inflicting cruel and unusual punishment by (1) failing to provide an effective pain medication for his prostate cancer, and (2) forcing him to experience withdrawals. (*Id.* at PageID.8, ¶¶ 1–3). After the parties completed discovery, Hallett moved for summary judgment on the merits of Harp's claims against her. (ECF No. 72).

## B.    Summary Judgment Standard

Summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

3

as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that would affect "the outcome of the suit under the governing law. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there . . . are any genuine factual issues that properly can be resolved only by a finder of fact . . . ." *Id.* at 249–50, 255. Accordingly, "the evidence, all facts, and any inferences that may be drawn from the facts" must be viewed "in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004). The nonmoving party cannot rebut a Rule 56 motion by merely alleging that a genuine factual dispute exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 n.3 (1986) (quoting Fed. R. Civ. P. 56(e)). Instead, the nonmoving party must show that there is sufficient evidence in the record for "a reasonable finder of fact [to] find in its favor." *Anderson*, 477 U.S. at 248.

## C.    Analysis

The Eighth Amendment prohibits "cruel and unusual punishment." U.S. Const. amend. VIII. This protection applies not only to the terms of a convicted defendants' sentence, but also to the "conditions under which" a prisoner "is confined." *Helling v. McKinney*, 509 U.S. 25, 31 (1993). Indeed, "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety

4

and general well being." *Wilson v. Williams*, 961 F.3d 829, 839 (6th Cir. 2020); *see also DeShaney v. Winnebago Cty. Dept. of Soc. Servs.*, 489 U.S. 189, 199–200 (1989). Thus, the state has a duty to provide for the prisoner's "basic human needs," including "food, clothing, shelter, medical care, and reasonable safety." *Deshaney*, 489 U.S. at 200.

An official violates the Eighth Amendment by inflicting "unnecessary and wanton" pain on inmates. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). In the medical context, an officer's "'deliberate indifference' to an inmate's 'serious medical needs'" constitutes the "unnecessary and wanton" infliction of pain proscribed by the Eighth Amendment. *Plair v. Holmes*, No. 1:19-cv-815, 2020 WL 8187989, at *5 (W.D. Mich. Dec. 29, 2020) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104–06 (1976)). To establish that prison officials violated the Eighth Amendment by denying medical care, the inmate must show (1) that he or she was deprived of an objectively serious medical need, and (2) that the defendant knew "of and disregard[ed] an excessive risk to [his or her] health or safety." *Farmer*, 511 U.S. at 837; *Rhinehart v. Scutt*, 894 F.3d 721, 737–38, (6th Cir. 2018).

For the following reasons, I suggest that Harp raises a genuine despute of material fact as to both whether Hallett deprived him of a serious medical need and whether Hallett acted with deliberate indifference to Harp's medical needs.

### 1.    Serious Medical Need

An inmate's need to establish the seriousness of his or her medical need derives from the Eighth Amendment's proscription of "cruel and unusual" punishment.  *Phillips v. Tangilag*, 14 F.4th 524, 534 (6th Cir. 2021).  State actors do not violate the Amendment merely because they impose "uncomfortable" prison conditions.  *Id.*  Sometimes, determining whether an inmate has been denied constitutionally required medical care is a simple task.  *See Rhinehart*, 894 F.3d at 737.  If a physician has opined that a condition requires care, or if the need for care would be obvious to even a layperson, then the prisoner can prove that his or her medical need was "serious."  *Id.*[1]  In these situations, all an inmate need do to establish that he or she was deprived of a serious medical need is demonstrate that officials provided either cursory treatment or no treatment at all.  *Rhinehart*, 894 F.3d at 737; *see also Dominguez v. Correctional Med. Servs.*, 555 F.3d 543, 551 (6th Cir. 2009).

Other times, however, this issue is more complex.  Several medical needs are not obvious to laypeople who are ill-equipped to assess an individual's need for medical care.  So to enable factfinders to determine whether the medical need is

---

[1] To be clear, the medical need at issue need not be "essential," as the Eighth Amendment does not apply only to life-threatening ailments.  *Gutierrez v. Peters*, 111 F.3d 1364, 1370–71 (7th Cir. 1997).  Thus, a physician or layperson may conclude that medical care is required whenever its denial would "result in" needless "pain and suffering."  *Id.* (internal quotation marks omitted) (quoting *Estelle*, 429 U.S. at 103).

6

adequately serious, the plaintiff must support his or her claim with medical evidence that establishes the "detrimental effect of the delay in medical treatment." *Napier v. Madison Cty.*, 238 F.3d 739, 742 (6th Cir. 2001) (internal quotation marks omitted); *see also Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013). Often, this requires plaintiffs to introduce "'expert medical testimony . . . showing the medical necessity for' the desired treatment." *Rhinehart*, 894 F.3d at 737–38 (quoting *Anthony v. Swanson*, 701 F. App'x 460, 464 (6th Cir. 2017)).

The same is true where a prisoner has received some care for an infliction but alleges that the care received was inadequate. *Phillips*, 14 F.4th at 534–35. Here too, the prisoner must support his or her claim with medical evidence and it may be necessary to provide medical expert testimony. *Id.* Cases concerning inadequate care, however, are held to a heightened standard. Because Courts should hesitate to second-guess medical judgments, a prisoner who challenges the adequacy of his or her care must demonstrate that the treatment received was so inadequate "as to shock the conscience or to be intolerable to fundamental fairness." *Miller v. Calhoun County*, 408 F.3d 803, 819 (6th Cir. 2005) (internal quotation marks omitted).

Hallett argues that Harp's claims fall into this last category of cases. In essence, she argues that Harp challenges the adequacy of his cancer treatment, which consisted of chemotherapy and radiation therapy in addition to pain management. (ECF No. 72, PageID.747). Thus, because Harp has not provided any medical

evidence to explain how her decision to end his morphine prescription was "intolerable to fundamental fairness," he cannot prove that he was deprived of a serious medical need.  (*Id.* at PageID.749).

But Harp's complaint centers on a more specific medical need.  Harp does not claim that Hallett failed to adequately treat his cancer, he claims that Hallett deprived him of necessary pain management and subjected him to opiate withdrawals.  (ECF No. 1, PageID.8, ¶¶ 1–3; *see also* ECF No. 35-3, PageID.234, 239).  That is, Harp's pain and withdrawals—not his cancer—are the relevant ailments.  (*Cf. West v. Jindall*, No. 2:21-cv-10225, ECF No. 112, PageID.1330–31).

And a reasonable factfinder could determine that Harp's pain and withdrawals required treatment even without the assistance of medical evidence.  Although Harp had been prescribed morphine through at least June 8, Hallett ended his prescription on May 15.  (ECF No. 72-1, PageID.778, 796).  That alone is enough for a layperson to determine that Hallett deprived Harp of a serious medical need.  *See Rhinehart*, 894 F.3d at 737 (quoting *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 897 (6th Cir. 2004).  And even if he had no prescription to begin with, a layperson would understand the need for cancer patient undergoing radiation and chemotherapy to have adequate pain management.  *See Lynch v. Wexford Health Servs.*, No. 2:13-cv-01470, 2016 WL 2944688, at *8–9 (S.D. W. Va. May 20, 2016).

8

So too could a reasonable layperson conclude that Harp required treatment for his withdrawal without medical evidence.  Withdrawal is a serious condition that requires medical attention.  *Stojcevski v. County of Macomb*, No. 15-11019, 2019 WL 4744432, at *10–11 (E.D. Mich. Sept. 30, 2019).  And here, Harp's withdrawal was both foreseeable and obvious.  Harp explains that before Hallett ended his prescription, he had taken morphine twice per day for about six months.  (ECF No. 72-1, PageID.800; *see also id.* at PageID.758 (recording that Harp had been prescribed morphine since at least April 16)).  With that extensive history of opioid use, a layperson could have foreseen an obvious need for Harp to be tapered off morphine.[2]

And if the need for tapering was not immediately obvious, it would have been once Harp began to experience symptoms of withdrawal.  Just a day after Hallett took him off morphine, Harp began to report symptoms of withdrawal, noting that he began to experience headaches, dizziness, "aching" pain throughout his "entire body," and "loose stools."   (ECF No. 72-1, PageID.800, 803).  Harp continued to report these symptoms to medical staff over the next several days. (*Id.* at

---

[2] *See generally FDA Identifies Harm Reported from Sudden Discontinuation of Opioid Pain Medicines and Requires Label Changes to Guide Prescribers on Gradual, Individualized Tapering*, FDA (April 9, 2019), https://www.fda.gov/drugs/drug-safety-and-availability/fda-identifies-harm-reported-sudden-discontinuation-opioid-pain-medicines-and-requires-label-changes; Dae Kim, M.D., *A Patient's Guide to Opioid Tapering*, Hospital for Special Surgery, https://www.hss.edu/conditions_patient-guide-opioid-tapering.asp (last updated June 26, 2023).

PageID.801–826) Even without objective medical evidence to corroborate his complaints, the Court must accept Harp's assertions as true. *See Cooper v. Casey*, 97 F.3d 914, 916–17 (7th Cir. 1996) ("[T]he fact that a condition does not produce 'objective' symptoms does not entitle the medical staff to ignore it."). And under Harp's version of events, a reasonable factfinder could find that Hallett's abrupt and premature decision to take Harp off morphine "cold turkey" deprived him of a serious medical need. *Cf. Stojcevski*, 2019 WL 4744432, at *10.

But suppose Hallett had correctly identified Harp's need for pain management and relief from withdrawal as the relevant medical needs at issue. Had she done so, her briefing alludes to another argument she might have raised for requiring Harp to present medical evidence establishing the seriousness of his medical need. True, Hallett explains, Harp may have been denied an otherwise necessary treatment, but that decision itself was a "medical judgment." (ECF No. 72, PageID.751). To Hallett, this shows that she did not act with deliberate indifference to Harp's medical needs. But it also follows that if her decision to withhold Harp's morphine was a "medical judgment," then its adequacy cannot be evaluated without the benefit of medical evidence. (*See id.*); *Rhinehart*, 894 F.3d at 737 (explaining that factfinders require medical evidence to assess the propriety of medical decisions). Put another way, a layperson could not determine whether Hallett's decision was so "grossly

10

incompetent" as to "shock the conscience" without relying on medical evidence to assess the soundness of her decision. *Phillips*, 14 F.4th at 534–35.

Indeed, Hallett explains that she ended Harp's prescription because nursing staff told her they suspected Harp of "cheeking" his morphine—that is, hiding the pills in his mouth rather than swallowing to build a stockpile of morphine—on at least two occasions.[3]  *See McKinney v. Sanders*, No. 08-cv-00723, 20019 WL 1809850, at *1 (W.D. Wash. June 19, 2009); (ECF No. 72-1, PageID.796, 814).  If true, this would not only put other inmates at risk of obtaining unprescribed narcotics,[4] but it would also enable to Harp to abuse his morphine by taking more

---

[3] Hallett claims to have also ended Harp's prescription because he asked her to do so. (ECF No. 72, PageID.751–52; *see also* ECF No. 72-1, PageID.796, 814).  Although it is true that prison officials do not violate the Eighth Amendment by failing to provide necessary treatment that an inmate refuses to accept, Harp signed a sworn declaration stating that he did not ask to be taken off Morphine.  *See Johnson v. Adams*, No. 9:14-CV-0811, 2016 WL 6604129, at *6 (N.D.N.Y. July 25, 2016); (ECF No. 74, PageID.863–64).  Even so, Hallett argues that the Harp's declaration cannot raise a genuine dispute of material fact because it is "conclusory," "speculative," and contrary to "objective" medical evidence. (ECF No. 75, PageID.875–76).  I disagree.  To start, there is nothing "conclusory" or "speculative" about Harp's assertions: Harp describes specific events about which he has personal knowledge.  *See EEOC v. Admiral Maint. Serv., L.P.*, 174 F.R.D. 643, 647 (N.D. Ill. 1997); Fed. R. Civ. P. 56(c)(1)(A), (c)(4).  Nor do Harp's assertions conflict with "objective" evidence.  Where a moving party presents objective evidence—such as video footage, audio recordings, or objective medical findings—a nonmoving party cannot raise a genuine dispute by merely denying that evidence in a declaration.  *Booher ex rel. T.W. v. Montavon*, 555 F. App'x 479, 484 (6th Cir. 2014).  But Hallett's treatment notes are not objective, unimpeachable findings; they are her own subjective accounts of her meetings with Harp.  Hallett's version of events is owed no more deference than Harp's, and she cannot transform her word into gospel by dressing up her testimony as medical notes.  *Cf. Eagan v. Dempsey*, 987 F.3d 667, 691–92 & n.56 (7th Cir. 2021).

[4] Although the Supreme Court has stated that "deliberate indifference to a prisoner's serious illness or injury" alone violates the Eighth Amendment, that language comes from an assumption that inmates' medical needs do "not ordinarily clash with other equally

than his prescribed dosage. *See Todd v. Bigelow*, 497 F. App'x 839, 841 (10th Cir. 2012). Yet how is a juror supposed to weigh the harm associated with Harp's withdrawal against the health risks from potential narcotics abuse? Such an inquiry requires a knowledge of pharmacology beyond that of the average person. *See Phillips*, 14 F.4th at 536.

So accepting Hallett's version of events, a factfinder would need medical evidence to find that Hallett's medical decision "was not just incompetent but grossly so." *Id.* Yet according to Harp, Hallett did not make her decision for medical purposes. He explains that after refusing to attend radiation treatment due to his conflict with the transportation officers, Hallett asked him to sign a "release of responsibility"—ostensibly a waiver of liability for Harp's physicians and the transportation officers—but Harp refused to sign. (ECF No. 74, PageID.862–63; *see* ECF No. 35-3, PageID.234, 239). And in retaliation, Hallett immediately accused him of "cheeking" his morphine and ended his prescription. (*See* ECF No. 74, PageID.862–63).

---

important governmental responsibilities." *Whitley v. Albers*, 475 U.S. 312, 320 (1986); *Estelle*, 429 U.S. at 105. In the rare situations where the provision of necessary medical care might impinge on other legitimate penological interests, the denial of otherwise necessary care does not violate the Eighth Amendment in itself. *Grenning v. Miller-Stout*, 739 F.3d 1235, 1240 (9th Cir. 2014); *Blouir v. Powers*, No. 4:07cv3103, 2009 WL 426279, at *5 (D.S.C. Feb. 19, 2009). In other words, the medical needs of both the plaintiff and other inmates are relevant in determining whether medical care is "necessary" and whether the denial of care constitutes unnecessary and wanton infliction of pain.

If Hallett's treatment decision was motivated by nonmedical factors, then Harp need not present medical evidence on his need for tapering and pain management. *Durmer v. O'Carroll*, 991 F.2d 64, 67–69 (3d Cir. 1993); *Johnston v. Correctional Med. Servs., Inc.*, No. 05-5235, 2008 WL 5401636, at *7–8 (D.N.J. Dec. 23, 2008).   After all, the purpose of the medical evidence requirement is to assist lay jurors in weighing the adequacy of competing treatment options. *Blackmore*, 390 F.3d at 898.   So if a physician has withheld prescribed treatment for nonmedical reasons, then a factfinder is no longer tasked with weighing various courses of treatment as the provider has not made a "medical judgment"; rather, the physician has simply interfered with a prescribed course of treatment. *See Johnson v. Cunnagin*, No. 21-5659, 2022 WL 2662001, at *2 (6th Cir. Feb. 24, 2002); *Richmond v. Huq*, 885 F.3d 928, 944 (6th Cir. 2018).   Put another way, an inmate who alleges that a physician withheld treatment for nonmedical reasons does not contest the adequacy of treatment, but instead alleges that the provider inflicted unnecessary and wanton pain.

So how can Harp raise a genuine dispute as to Hallett's motives?   While the Sixth Circuit has not addressed this issue in the Eighth Amendment context, in other areas, it has applied a burden-shifting scheme to assess whether plaintiffs have raised a genuine dispute as to whether a defendant acted with a retaliatory motive. *Thaddeus-X v. Blatter*, 175 F.3d 378, 399–400 (6th Cir. 1999).

13

Motive is "usually" a "factual issue to be resolved by a jury." *Harris v. Bornhorst*, 513 F.3d 503, 519–20 (6th Cir. 2008).  Still, "a court may grant summary judgment" when "warranted." *Hartsel v. Keys*, 87 F.3d 795, 803 (6th Cir. 1996).  While Harp could survive summary judgment by providing direct evidence of Hallett's nonmedical motivations, cases "where a defendant testifies on the record that [he or she] intended to retaliate against a prisoner" are "[r]are."  And this is not one of those "rare" cases. *King v. Zamiara*, 680 F.3d 686, 701 (6th Cir. 2012).  So to raise a genuine dispute as to Hallett's motives, Harp must present enough circumstantial evidence for a reasonable juror to infer that she ended his prescription in retaliation for failing to refusing to sign the release of responsibility. *See Thaddeus-X*, 175 F.3d at 399.

To do so, Harp bears the initial burden of presenting evidence from which a juror could find that his refusal to sign the form was a "motivating factor behind" Hallett's decision. *Id.*  If Harp produces such evidence, then the burden of production shifts to Hallett to show that a reasonable factfinder must accept that she "would have taken the same action in the absence" of Harp's refusal. *Id.*

Harp's strongest circumstantial evidence of Hallett's improper motive is the timing between his refusal to sign the release form and Hallett's decision to end his prescription.  While temporal proximity can serve as potent evidence of retaliation, the Sixth Circuit has cautioned against relying on temporal proximity alone to prove

14

retaliatory motive. *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir.2010). Often, temporal proximity must be accompanied by other circumstantial evidence of retaliation. *Id.* at 401. Exactly, how much additional evidence the plaintiff must present, however, depends on how much time elapsed between the action prompting the alleged retaliation and the adverse conduct. *Id.* The further apart these events are, the more additional circumstantial evidence is typically required for a reasonable factfinder to infer retaliatory motive. *Id.*

Still, when an adverse action immediately follows a plaintiffs' conduct, a reasonable juror may often infer that the plaintiff's conduct motivated the adverse action from the temporal proximity alone. Take *Mickey v. Zeidler Tool & Die Co.*, for example. 516 F.3d 516 (6th Cir. 2008). There, an employee alleged that his employer retaliated against him for filing a charge with the Equal Employment Opportunity Commission after firing him the "very day" he learned of his charge. *Id.* at 525. The Court reasoned that this timing was enough for a reasonable factfinder to infer that the employer terminated the employee because of his charge, explaining that because "the two actions happened consecutively, . . . little other than the protected the protected activity could [have motivate[d] the" termination. *Id.* Further, employees who are retaliated against immediately after engaging in a protected activity have no opportunity to "couple temporal proximity" with any other evidence of retaliation, so requiring employees in these circumstances to

provide more evidence than just timing would "ironically" immunize employers who "retaliate swiftly and immediately . . . ." *Id.*; *accord Maben v. Thelen*, 887 F.3d 252, 268 (6th Cir. 2018) (holding that a reasonable juror could find that a prison official retaliated against a prisoner for complaining about his meal portions from the fact that the official issued a misconduct against the prisoner "immediately" after the inmate raised the issue) (emphasis removed).

As in *Mickey*, Hallett's suspicious timing creates a genuine, factual dispute as to her motive.  Accepting Harp's version of events as true, Hallett approached him to sign a release form, and only after Harp refused to sign the form did she immediately accuse him of cheeking medication.  ECF No. 74, PageID.862–63; *see* ECF No. 35-3, PageID.234, 239).  A reasonable factfinder could infer that Hallett's accusation was responsive to Harp's refusal to sign the form, rather than any legitimate concern that Harp may have been hoarding medication.  *Cf. Maben*, 887 F.3d at 268; *Mickey*, 516 F.3d at 525.

True, one could argue, Hallett did end Harp's prescription immediately after he refused to sign the release form.   But that is explained by the fact that she learned that Harp was suspected of cheeking morphine.   Thus, a factfinder could not reasonably infer from timing alone that Hallett ended Harp's prescription because of his refusal to sign the release.

Yet the record contains evidence from which a factfinder could question the veracity of Hallett's explanation.  To start, Harp's medical record does not mention that he was suspected of cheeking until his May 15 meeting where here refused to sign the release form even though he had taken morphine twice per day for the last six months.  (ECF No. 72-1, PageID.796, 800, 814; *see also* ECF No. 72-2).  In fact, Harp had met with Hallett just five days earlier, and her notes from that appointment also do not mention that she suspected Harp of hoarding morphine.  (ECF No. 72-1, PageID.784–90).

And while Hallett claims to have been told by nursing staff that they suspected Harp of cheeking morphine on two occasions, nursing staff made three entries in Harp's medical record between both of Harp's appointments with Hallett, and none of their notes mention any suspicions that Harp may have been cheeking pills.  (*Id.* at PageID.792–95).  What their notes do mention, however, is that Harp had started refusing to attend radiation therapy—which was the impetus for Hallett asking Harp to sign the release of responsibility.  (*Id.* at PageID.792, 795).  In addition, not only is Harp's medical record silent on his suspected cheeking until he refused to sign the release form, but he also never received a misconduct ticket for cheeking morphine. (ECF No. 35-4).

Further, Hallett provides few details on why she suspected Harp of cheeking morphine.  Hallett states only that some unidentified nurses suspected Harp of

17

cheeking pills.  (ECF No. 72-2, PageID.856).  But who were these nurses, why did they suspect Harp of cheeking pills, and more to the point—when did they share their suspicions with Hallett?  The longer Hallett sat on this information before raising it with Harp, the less likely it motivated her to end Harp's prescription.  That, and her failure to provide basic details regarding the basis for her suspicions, cuts against her credibility.

Between Hallett's undetailed explanations, the suspicious timing of her concerns, and the paucity of corroboration anywhere in Harp's records, a reasonable factfinder could conclude that Hallett fabricated her justification for ending Harp's prescription after retaliating against Harp for refusing to sign the release. Accordingly, Harp raises a genuine dispute of material fact as to whether Hallett's decision to abruptly take him off morphine was a medical decision.  Thus, a reasonable juror could determine, without the use of medical evidence, that Hallett deprived Harp of a serious medical need by interfering with a prescribed course of treatment.

### 2.    Deliberate Indifference

For similar reasons, Harp raises a genuine dispute as to whether Hallett acted with deliberate indifference to his medical needs.  To show that a defendant was deliberately indifferent, a plaintiff must, at a minimum, prove that the defendant knew "of the facts that show the serious medical need," that he or she "personally

conclude[d] that" the need existed," and that the defendant then "consciously disregarded" the need. *Id.* The defendant need not have acted with the specific intent that the prisoner would be harmed—it is enough to show that he or she consciously disregarded a perceived risk. *Burwell v. City of Lansing*, 7 F.4th 456, 465 (6th Cir. 2021). In addition, "'[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.'" *Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020) (quoting *Farmer*, 511 U.S. at 834).

Harp identifies evidence from which he can prove more than mere negligence. Viewing the facts in his favor, Hallett intentionally sent Harp into withdrawal—not for any medical purposes, but out of retaliation for Harp's refusal to sign the release form. That gratuitous infliction of pain, severed from any medical or penological purpose, satisfies the subjective element of Harp's Eighth Amendment claim. *See Richmond*, 885 F.3d at 944; *Durmer*, 991 F.2d at 67–69; *Boretti v. Wiscomb*, 930 F.2d 1150, 1154 (6th Cir. 1991). Harp, therefore, also raises a genuine dispute as to whether Hallett acted with deliberate indifference to his medical needs.

### D. Conclusion

For these reasons, **I RECOMMEND** that this Court **DENY** Hallett's motion for summary judgement (ECF No. 72).

19

## III.   **REVIEW**

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy."  Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this R&R.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this R&R to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address

each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  August 1, 2023                          s/ PATRICIA T. MORRIS
                                               Patricia T. Morris
                                               United States Magistrate Judge